## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

**IN RE EXPRESS SERVICES, INC. DATA BREACH LITIGATION**

Case No. 5:24-cv-00974

Hon. Judge Bernard Jones

**JURY TRIAL DEMANDED**

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Kurtis Sabo, Russell Karli, and Kristin Lunsford ("Plaintiffs"), individually and on behalf of all other similarly situated individuals (the "Class" or "Class Members," as defined below), by and through their undersigned counsel, file this Consolidated Class Action Complaint against Express Services, Inc. ("Express" or "Defendant") and allege the following based on personal knowledge of facts, upon information and belief, and based on the investigation of their counsel as to all other matters.

## I.    NATURE OF THE ACTION

1.    Plaintiffs bring this class action lawsuit against Express for its failure to protect and safeguard Plaintiffs' and the Class's highly sensitive personally identifiable information ("PII").[1] As a result of Express's negligence and insufficient data security,

---

[1] The Federal Trade Commission ("FTC") defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth. . . ." 17 C.F.R. § 248.201(b)(8).

cybercriminals easily infiltrated Defendant's inadequately protected email accounts and **stole** the PII of Plaintiffs and the Class (the "Data Breach" or "Breach").[2] Now, Plaintiffs' and the Class's PII is in the hands of cybercriminals who have **already begun** to use their PII for nefarious purposes.

2.      Express is a staffing agency that matches job seekers, such as Plaintiffs and Class Members, with available jobs. To facilitate employment, Express requires Plaintiffs and Class Members provide it with their highly sensitive PII, including their names, Social Security numbers, driver's license numbers, financial information (*e.g.*, account numbers, credit or debit card numbers), medical information, and/or health insurance information (collectively, "Private Information").

3.      Businesses that handle Private Information—such as Express—owe the individuals to whom the Private Information belongs a duty to adopt reasonable data security measures to protect their PII from theft by unauthorized third parties. This duty arises under contract, statutory and common law, industry standards, representations made to Plaintiffs and Class Members, and because it is foreseeable that hackers with nefarious intentions will target the Private Information and use it to harm the victims.

4.      On September 13, 2024, Express filed a data security breach report with the Texas Attorney General's Office after discovering that an unauthorized actor gained access to two (2) company email accounts on June 21, 2024.[3] In this notice, Express confirmed that the unauthorized actor **accessed and copied** Plaintiffs' and Class Members' sensitive

---

[2] *See* Exs. 1–3 (Plaintiffs' Notice of Data Breach Letters).
[3] *Id.*

PII.[4]

5.      The total number of Data Breach victims has yet to be disclosed, but at least 5,941 Texas residents were impacted by the Breach.[5]

6.      The PII **stolen** in the Data Breach included highly sensitive private information such as: names, Social Security numbers, driver's license numbers, financial information (*e.g.*, account numbers, credit or debit card numbers), medical information, and health insurance information.[6]

7.      Due to Defendant's negligence, cybercriminals have **stolen** and obtained everything they need to commit identity theft and wreak havoc on the financial and personal lives of thousands of individuals.

8.      Despite Defendant discovering the Breach on or around June 21, 2024, Defendant did not begin sending Notice of Data Breach Letters ("Notice Letters") to victims of the Data Breach until in or around September 2024.[7]

9.      Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Express. Thus, Express knew that failing to take reasonable steps to secure Plaintiffs' and the Class's Private Information left it in a dangerous condition.

---

[4] *Id.*
[5] *Data Security Breach Reports*, ATTORNEY GENERAL OF TEXAS, available at https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (search "Express Services, Inc.") (last visited Dec. 17, 2024).
[6] *Id.*
[7] *See* Exs. 1–3.

10.    The Data Breach—which Express failed to detect until cybercriminals had already **copied and stolen** Plaintiffs' and Class Members' Private Information—is the direct result of Express's failure to implement basic data security measures or employ proper oversight of Plaintiffs' and the Class's PII in its custody and control. Had Express implemented reasonable cybersecurity measures—including adequate safeguards for initial access, encryption and redaction of personal data elements, and sufficient logging, monitoring, and alerting tools to detect unauthorized activity—the hackers would not have been able to hack into Express's email accounts and **exfiltrate** Plaintiffs' and Class Members' PII before being detected.

11.    Express failed to adequately protect Plaintiffs' and Class Members' Private Information by failing to encrypt or redact this highly sensitive data when it was maintained on Express's internet accessible email accounts. This unencrypted, unredacted Private Information was compromised due to Express's negligent acts and omissions and utter failure to protect Plaintiffs' and Class Members' sensitive Private Information.

12.    Express breached its duties and obligations by failing to: (i) to design, implement, monitor, and maintain reasonable email safeguards against foreseeable threats; (ii) to design, implement, and maintain reasonable data retention policies; (iii) to adequately train or oversee employees regarding data security and phishing attacks; (iv) to comply with industry-standard data security practices; (v) to warn Plaintiffs and Class Members of Express's inadequate data security practices; (vi) to encrypt or adequately encrypt the Private Information that was stored on Express's email accounts; (vii) to recognize or detect that its email accounts had been compromised and accessed in a timely

manner; (viii) to utilize widely available software able to detect and prevent this type of attack; and (ix) to otherwise adequately secure Plaintiffs' and Class Members' Private Information using reasonable and effective data security procedures.

13.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality and security of their Private Information. In providing their Private Information to Express, Plaintiffs and the Class Members reasonably expected this sophisticated business entity to keep their Private Information confidential and to use this information for only legitimate purposes related to Express's business, and to disclose it only as authorized. Express failed to do so, resulting in the unauthorized disclosure of Plaintiffs' and Class Members' Private Information in the Data Breach

14.    Hackers targeted and obtained Plaintiffs' and Class Members' Private Information from Express because of PII's value and the value of exploiting and stealing Plaintiffs' and Class Members' identities.  As a direct and proximate result of Express's inadequate data security and breaches of its duties to handle Private Information with reasonable care, Plaintiffs' and Class Members' Private Information was **accessed and acquired** by cybercriminals and exposed to an untold number of unauthorized individuals. The present and continuing risk to Plaintiffs and Class Members as victims of the Data Breach will remain for their respective lifetimes.

15.    The harm resulting from a data breach like this manifests in numerous ways, including identity theft and financial fraud. The exposure of an individual's Private Information in a data breach ensures that the individual will be at a substantially increased and certainly impending risk of identity theft and fraud for the rest of his or her life.

Mitigating that risk, to the extent possible, requires individuals to devote significant time and money to closely monitor their credit, financial accounts, and email accounts, and take several additional prophylactic measures. Plaintiffs and Class Members will be forced to allocate time to these tasks for years, if not their lifetimes, due to Express's Data Breach.

16. The risk of identity theft caused by this Data Breach has already materialized, as there is evidence that the Plaintiffs' and Class Members' Private Information was **targeted, accessed, and misused**.

17. In sum, Plaintiffs and the Class will face an imminent risk of fraud and identity theft for the rest of their lives because (i) Express failed to protect Plaintiffs' and the Class's PII, allowing a massive and preventable Data Breach to occur; (ii) the cybercriminals who perpetrated the Breach **stole** Private Information that they will post and/or sell on the dark web (if they have not already); (iii) Express failed to provide any assurance that it paid a ransom to prevent Plaintiffs' and the Class's data from being released on the dark web; and (iv) Express offered limited credit monitoring services to Plaintiffs and the Class, an offer it need not make if no PII was stolen and at risk of misuse.

18. To recover for these harms, Plaintiffs, on behalf of themselves and the Class as defined herein, bring claims for negligence, negligence *per se*, breach of implied contract, unjust enrichment, and declaratory/injunctive relief, to address Express's inadequate safeguarding of Plaintiffs' and Class Members' Private Information. Plaintiffs seek compensatory damages, punitive damages, nominal damages, restitution, injunctive and declaratory relief, reasonable attorney fees and costs, and all other remedies this Court deems proper.

6

## II.     THE PARTIES

19.     Plaintiff **Kurtis Sabo** is an individual domiciled in Annandale, Minnesota. Plaintiff Sabo received a Notice of Data Breach Letter from Express dated September 13, 2024, notifying him that his Social Security number was accessed and copied from Defendant's email accounts.

20.     Plaintiff **Russell Karli** is an individual domiciled in Bryan, Texas. Plaintiff Karli received a Notice of Data Breach Letter from Express dated September 13, 2024, notifying him that his Social Security number was accessed and copied from Defendant's email accounts.

21.     Plaintiff **Kristin Lunsford** is an individual domiciled Bryan, Texas. Plaintiff Lunsford received a Notice of Data Breach Letter from Express dated September 13, 2024, notifying her that her Social Security number was accessed and copied from Defendant's email accounts.

22.     Defendant **Express Services, Inc.** is a foreign for-profit business corporation registered to do business in the State of Oklahoma. Express's principal place of business is located at 9701 Boardwalk Blvd., Oklahoma City, Oklahoma 73162. Express's registered agent is C.T. Corporation System, located at 1833 South Morgan Rd., Oklahoma City, OK 73128.

## III.     JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than one hundred

putative Class Members, and minimal diversity exists because many putative Class Members are citizens of a different state than Defendant.

24.    This Court has personal jurisdiction over Defendant because Defendant is registered to do business in the State of Oklahoma; has its principal place of business in this District; conducts substantial business in this District through its headquarters, offices, and affiliates; engaged in the conduct at issue here in this District; and/or otherwise has substantial contacts with this District and purposely availed itself to the Courts in this District.

25.    Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) as a substantial part of the events giving rise to the claims emanated from activities within this District.

## IV.    FACTUAL ALLEGATIONS

### A.    Express's Business.

26.    According to Express, it is one of the top staffing companies in the United States.[8] "Internationally headquartered in Oklahoma City with a global presence, Express Employment Professionals stands as an Entrepreneur Franchise 500 company, recognized by Forbes as one of the Best Franchises to Buy and featured on Staffing Industry Analyst's Largest Global Staffing Firms list."[9]

---

[8]    EXPRESS EMPLOYMENT PROFESSIONALS, https://www.expresspros.com/who-we-are/who-we-are (last visited Dec. 17, 2024).
[9] *Id.*

27.     Express matches "job seekers with positions that align with their skills and experience."[10]

28.     Express claims to have "put more than 5 million people to work worldwide."[11]

29.     Express has "more than 860 franchise locations in the U.S., Canada, South Africa, Australia, and New Zealand. Express International boasts a team of more than 250 professionals in Oklahoma City and a network of sales and support teams internationally."[12]

30.     On March 4, 2024, Express announced via press release that it had the "third-best year for sales in the staffing company's more than 40-year history" and "saw revenues of $4.1 billion in 2023, employing 492,000 associates at 862 franchise locations across the globe."[13]

31.     These data points make it apparent that Express could have afforded to implement adequate data security prior to the Data Breach but deliberately chose not to. Instead, Express chose to save money by not making necessary data security expenditures and unjustly enriched itself.

---

[10] *Id.*

[11] *Id.*

[12] EXPRESS EMPLOYMENT PROFESSIONALS, https://www.expresspros.com/who-we-are/international-hq (last visited Dec. 17, 2024).

[13] *Express Employment Professionals' Third-Best Sales Year Signals Strong Market Presence*, PR NEWSWIRE (Mar. 11, 2024) https://www.prnewswire.com/news-releases/express-employment-professionals-third-best-sales-year-signals-strong-market-presence-302084171.html (last visited Dec. 17, 2024).

**B. Express Collected Plaintiffs' and the Class's Private Information for Financial Gain.**

32.    In the ordinary course of business, Express receives the Private Information of individuals, such as Plaintiffs and the Class, from the entities and individuals that utilize Express's services.

33.    Express obtains, collects, uses, and derives a benefit from the Private Information of Plaintiffs' and Class Members.

34.    Express uses the Private Information it collects to provide employment services, making a profit therefrom.

35.    Express would not be able to obtain revenue if not for the acceptance and use of Plaintiffs' and the Class's Private Information.

36.    By collecting Plaintiffs' and the Class's Private Information, Express assumed legal and equitable duties to Plaintiffs and the Class to protect and safeguard their Private Information from unauthorized access and intrusion.

37.    At all relevant times, Express knew it was storing and using its email accounts to store and transmit valuable, sensitive Private Information and that as a result, its email accounts would be attractive targets for cybercriminals.

38.    Express also knew that any breach of its email accounts and the exposure of the data stored therein would result in the increased risk of identity theft and fraud for the thousands of individuals whose Private Information was improperly stored therein, as well as intrusion into their private and sensitive personal affairs.

39.    In exchange for receiving Plaintiffs' and Class Members' Private Information, Express promised to safeguard this sensitive and confidential data, to use it only for authorized and legitimate purposes, and to delete such information from its systems once there was no longer a need to maintain it.

40.    Upon information and belief, Express made promises and representations to Plaintiffs and Class Members that the Private Information collected from them as a condition of obtaining services from Express, directly and indirectly, would be kept safe and confidential, that the information's privacy would be maintained, that Express would delete any sensitive information after it was no longer required to maintain it.

41.    On information and belief, Express made promises in writing, through privacy statements and related representations in documents provided to Plaintiffs and Class Members, to keep Plaintiffs' and Class Members' Private Information confidential through reasonable and legally compliant data security measures.

42.    Indeed, Express recognized its duties to safeguard Plaintiffs' and Class Members' PII and made the following claim on its website regarding its protection of sensitive data: "[w]e use reasonable security measures."[14]

43.    According to Bill Stoller, the Chief Executive Officer of Express, "[w]e can all do a better job protecting ourselves online, whether it's using strong passwords and two-

---

[14]    *Privacy Policy*, EXPRESS EMPLOYMENT PROFESSIONALS (Jan. 1, 2024) https://www.expresspros.com/Privacy-Policy.aspx (last visited Dec. 17, 2024).

factor authentication or staying up-to-date on the latest technologies and trends[.]"[15]
"Everyone is at risk-especially if they don't realize it."[16]

44.    In the words of Express's CEO, Express could have done a better job of
protecting Plaintiffs' and Class Members' Private Information by using strong passwords,
two-factor authentication, and by staying up to date with the latest technology and trends.
But Express did not.

45.    Express's assurances of maintaining high standards of cybersecurity make it
evident that Express recognized it had a duty to use reasonable measures to protect the
Private Information that it collected and maintained but deliberately failed to do so.

46.    Express violated its own privacy statement and failed to adopt reasonable
and appropriate security practices and procedures including administrative, physical
security, and technical controls to safeguard Plaintiffs' and the Class's Private Information.

47.    As a result, Plaintiffs' and Class Members' PII was **accessed and stolen** from
Express's inadequately secured email accounts in a massive and preventable Data Breach.

**C. Express's Massive and Preventable Data Breach.**

48.    According to the Notice of Data Breach Letters sent to victims of the Data
Breach, on June 21, 2024, Express identified suspicious activity occurring within a
company email account.[17]

---

[15] *Survey: Despite the Risks, Employees' Password Changing Habits are Lax*, Express
Employment    Professionals    (June    26,    2019,    9:50    ET)    available    at
https://www.prweb.com/releases/survey-despite-the-risks-employees-password-
changing-habits-are-lax-888092622.html (last visited Dec. 17, 2024).
[16] *Id.*
[17] Exs. 1–3.

49.     After an investigation, Express learned that between May 7, 2024, and June 20, 2024—or for approximately one (1) month—an unknown actor had unfettered access to two (2) company email accounts.[18]

50.     Express specifically admitted that the PII of Plaintiffs and Class Members was **accessed, copied, and stolen** from the email accounts during the Data Breach.[19]

51.     The Private Information **stolen** in the Data Breach included at least: names, Social Security numbers, driver's license numbers, financial information (*e.g.*, account numbers, credit or debit card numbers), medical information, and/or health insurance information.[20]

52.     Plaintiffs' and Class Members' Private Information was **targeted, accessed, and stolen** by cybercriminals in the Data Breach.  Express's insufficient data security for Plaintiffs' and Class Members' Private Information caused and allowed criminals to target and easily take files containing Plaintiffs' and Class Members' inadequately protected and unencrypted Private Information from Express's email accounts.

53.     As the Data Breach and its timeline evidence, Express did not use reasonable security measures appropriate to the nature of the sensitive Private Information collected from Plaintiffs and Class Members and maintained on Express's email accounts, such as encrypting the information, deleting the data from Express's email accounts when it was

---

[18] *Id.*

[19] *Id.*

[20] *Data Security Breach Reports*, ATTORNEY GENERAL OF TEXAS, available at https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (search "Express Services, Inc.") (last visited Dec. 17, 2024).

no longer needed, requiring sufficient verification such as multi-factor authentication for email accounts storing Private Information, training employees about phishing attacks, cybersecurity, and attempts to gain unauthorized access, investigating and addressing vulnerabilities in its data security practices, and/or implementing the necessary safeguards to enable Express to identify malicious activity and curtail it when it happens. These failures allowed and caused cybercriminals to target Express's email accounts and carry out the Data Breach.

54.    To make matters worse, Express delayed giving notice of the Data Breach to the victims.

55.    Despite discovering the Data Breach on June 21, 2024, Express did not begin notifying victims of the Data Breach until on or around September 13, 2024—nearly three (3) months later.[21]

56.    Omitted from the Notice Letters were the details of the root cause of the Data Breach, the vulnerabilities exploited, when the Data Breach began and ended, why Express failed to notify victims of the Data Breach until weeks after it began, and the remedial measures taken to ensure such a breach does not occur again. To date, these critical facts have not been provided to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information is protected.

57.    The fact that it took Express approximately three (3) months to investigate the Data Breach and send Notice Letters to victims confirms Express had severely deficient

---

[21] Exs. 1–3.

data security. Had Express implemented standard and reasonable digital forensic measures such as timestamping, intrusion detection systems, and logging aspects, it would be prepared for a forensic investigation of compromised information and would not need three (3) months to identify the information involved in the Data Breach and those impacted. These failures exacerbated Plaintiffs' and Class Members' damages, including actual damages in the form of lost opportunity costs, among others, by delaying and obfuscating Express's notice of the Data Breach and depriving Plaintiffs and Class Members of crucial time to mitigate and address it in a timely manner, like by putting credit freezes on their accounts or obtaining identity theft protection services.

58.     In recognition of the severity of the Data Breach, and the imminent risk of harm Plaintiffs and the Class face, Express made a measly offering of twelve (12) months of credit monitoring and identity theft protection services.[22] Such an offering is inadequate and will not prevent identity theft but will only alert Data Breach victims once identity theft has **already occurred**.

59.     Express could and should have prevented this Data Breach by ensuring its email accounts containing Plaintiffs' and Class Members' Private Information were properly secured, sanitized, and encrypted and by using appropriate clearinghouse practices to purge data that it was no longer required to maintain, but failed to do so.

60.     Express could and should have properly monitored its email accounts for unauthorized access and unusual activity, including the downloading of large amounts of

---

[22] *Id.*

sensitive PII from its email accounts.

61.    Additionally, Express could have prevented this Data Breach by examining, testing, and updating its cybersecurity practices to ensure vulnerabilities were identified and addressed and reasonable safeguards were continuously maintained, but failed to do so.

62.    All in all, Express failed to take the necessary precautions required to safeguard and protect Plaintiffs' and Class Members' PII from unauthorized access and exploitation.

63.    Defendant's actions represent a flagrant disregard of the rights of Plaintiffs and the Class, both as to privacy and property.

**D.  Express has a Repeated Pattern and Practice of Inadequate Data Security.**

64.    Express has a well-established history of failing to protect sensitive PII in its possession. In fact, Express' failure to protect sensitive information has been brought to light on more than one occasion.

65.    On October 15, 2020, Express learned that a break-in occurred at one of its field offices in which some of Express's documents and other property was stolen.[23] The stolen documents contained personally identifiable information.[24] Express had reason to

---

[23]    OFFICE OF THE MAINE ATTORNEY, available at Generalhttps://www.maine.gov/ag/attachments/985235c7-cb95-4be2-8792-a1252b4f8318/8005246c-5311-47ea-837f-8828d617407e/1b820b74-5b75-419e-aeb8-fb2fa6b06abc/Express%20Services%20Notification.pdf (last visited Dec. 17, 2024).
[24]    *Data Breach Notifications*, Express Services, Inc., OFFICE OF THE MAINE ATTORNEY https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/8005246c-5311-47ea-837f-8828d617407e.shtml (last visited Dec. 17, 2024).

believe fraud and identity theft would result from the incident and provided credit monitoring identity theft services to approximately 922 individuals.[25]

66.    Most recently, on October 21, 2024—shortly after the Data Breach at issue— a researcher known as "JayeLTee" found that Express was leaking millions of individuals' passwords, resumes, and other personal information from a server containing two (2) compressed database backups.[26]

67.    The two unsecured databases relate to "expresspersonnel.com" and "franchises.expresspersonnel.com," both of which are affiliated with Express.[27]

68.    The first data set included around 4GB of data and contained many tables of sensitive information. One of the tables contained close to four million (4,000,000) records related to individuals' previous employment, such as how much they were paid, how long they were employed there, why they left, and contact information for their previous employers, as pictured below:[28]

---

[25] *Id.*

[26] *Express Services Disclosed a Data Breach. One Month Later, they Learned they had a Second Data Security Problem*, DATABREACHES.NET (Dec. 4, 2024), https://databreaches.net/2024/12/04/express-services-disclosed-a-data-breach-one-month-later-they-learned-they-had-a-second-data-security-problem/ (last visited Dec. 17, 2024).
[27] *Id.*

[28] Jayeltee, *Expresspros.com (Express Employment International)*, THE HUB OF STUPI..*MISCONFIGS (Nov. 28, 2024), https://jltee.substack.com/p/expressproscom-express-employment-international (last visited Dec. 17, 2024).
[28] *Id.*



The records exposed on AppUserEmployment table. Redacted fields to avoid leaking identifying data points.

69.     Another table within the same data set contained 1,638,467 unique

passwords, names, and answers to security questions in plain text, as depicted below:[29]

```
iIndCtlNum, sLoginName, sPassword, dtDateSetInactive, iActive,
sSecurityQuestion, sSecurityAnswer, sFirstName, sMiddleName, sLastName,
iUserType, iPrimaryLang, dtDateUpdate, sUserUpdate, dtDateCreate, sUserCreate,
sSessionId, iIndCtlNumOld, iPIN, UserId, iPreferredContactMethod
```

WebUserMaster table with plaintext passwords and security question answers.

---

[29] *Id.*

70.    Other tables within the first data set included 1.5 million individuals' resumes in XML format, 2,105,482 unique phone numbers, and 1,705,293 addresses.[30]

71.    The second data set was 1GB in size and contained 904,985 unique passwords, again in plaintext.[31] The total amount of unique passwords between both data sets was 2,439,744.[32]

72.    After verifying the information found was legitimate and from Express, JayeLTee contacted Express, as pictured below:[33]



73.    Purportedly, around 12 hours after JayeLTee's email to Express, the

[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.*

exposure was closed.[34]

74.    JayeLTee emailed the company again on November 25, 2024, asking Express additional questions, but they went unanswered:[35]



Follow up email sent on November 25th

75.    Due to Express's recent run of data security flaws, it is evident that Express does not take data security seriously and does little, if anything, to protect Plaintiffs' and Class Members' PII in its possession.

76.    Express has flagrantly dishonest data security practices that Plaintiffs seek to remedy through this class action lawsuit.

---

[34] *Id.*
[35] *Id.*

**E.  Cybercriminals Have Used and Will Continue to Use Plaintiffs' and the Class's PII to Defraud Them.**

77.    PII is of great value to hackers and cybercriminals, and the Private Information **stolen** in the Data Breach can and will be used in a variety of ways by criminals to exploit Plaintiffs and the Class Members and to profit off their misfortune.

78.    Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[36]

79.    For example, with the PII **stolen** in the Data Breach, including Social Security numbers, identity thieves can open financial accounts, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[37] These criminal activities have and will result in devastating financial and personal losses to Plaintiffs and the Class Members.

80.    Social security numbers are particularly sensitive pieces of personal information.  As the Consumer Federation of America explains:

> **Social Security number.** *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refunds, employment – even

---

[36] *Facts + Statistics: Identity Theft and Cybercrime*, INSURANCE INFO. INST., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity") (last visited Dec. 17, 2024).

[37] *See, e.g.*, Christine DiGangi, *What Can You Do with a Stolen Social Security Number*, CREDIT.COM (June 29, 2020), https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/ (last visited Dec. 17, 2024).

using your identity in bankruptcy and other legal matters. It's hard to change your Social Security number and it's not a good idea because it is connected to your life in so many ways.[38]

[Emphasis added.]

81.    PII is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it for years.[39]

82.    This was a financially motivated Breach, as the only reason the cybercriminals go through the trouble of running targeted cyberattacks against companies like Express is to get ransom money and/or information that they can monetize by selling on the black market for use in the kinds of criminal activity described herein.

83.    Indeed, a social security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[40]

84.    "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[41]

---

[38] *Dark Web Monitoring: What You Should Know*, CONSUMER FEDERATION OF AMERICA (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/ (last visited Dec. 17, 2024).
[39] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, available at https://www.gao.gov/products/gao-07-737.
[40] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web* (Nov. 15, 2017), https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web (last visited Dec. 17, 2024).
[41] *Dark Web Monitoring: What You Should Know*, CONSUMER FEDERATION OF AMERICA (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/ (last visited Dec. 17, 2024).

85.    These risks are both certainly impending and substantial. As the Federal Trade Commission ("FTC") has reported, if hackers get access to PII, ***they will use it***.[42]

86.    Hackers may not use the information right away, but this does not mean it will not be used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information ***may continue for years***. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[43]

87.    For instance, with a stolen social security number, which is part of the PII compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[44]

88.    With this Data Breach, identity thieves have already started to prey on the Express Data Breach victims, and we can anticipate that this will continue.

89.    Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the future.[45]

---

[42] Ari Lazarus, *How fast will identity thieves use stolen info?*, MILITARY CONSUMER (May 24, 2017), https://www.militaryconsumer.gov/blog/how-fast-will-identity-thieves-use-stolen-info (last visited Dec. 17, 2024)..

[43] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown,* GAO (July 5, 2007), available at https://www.gao.gov/products/gao-07-737.

[44] *See, e.g.*, Christine DiGangi, *What Can You Do with a Stolen Social Security Number*, CREDIT.COM (June 29, 2020), https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/ (last visited Dec. 17, 2024).

[45] *Guide for Assisting Identity Theft Victims*, FEDERAL TRADE COMMISSION (Sept. 2013), available at https://www.global-screeningsolutions.com/Guide-for-Assisting-ID-Theft-Victims.pdf.

90.    Defendant's offer of one (1) year of credit monitoring to Plaintiffs and the Class is woefully inadequate and will not fully protect Plaintiffs from the damages and harm caused by its failures.

91.    The full scope of the harm has yet to be realized. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used.

92.    Once the twelve (12) months have expired, Plaintiffs and Class Members will need to pay for their own identity theft protection and credit monitoring for the rest of their lives due to Express's gross negligence.

93.    Furthermore, identity monitoring only alerts someone to the fact that they have **already been the victim of identity theft** (*i.e.*, fraudulent acquisition and use of another person's PII)—it does not prevent identity theft.[46]

94.    "The people who trade in stolen personal information [on the dark web] won't cooperate with an identity theft service or anyone else, so it's impossible to get the information removed, stop its sale, or prevent someone who buys it from using it."[47]

95.    As a direct and proximate result of the Data Breach, Plaintiffs and the Class have been damaged and have been placed at an imminent, immediate, and continuing increased risk of harm from continued fraud and identity theft. Plaintiffs and the Class must now take the time and effort to mitigate the actual and potential impact of the Data Breach

---

[46] *See, e.g.*, Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*, CNBC (Nov. 30, 2017, 9:00 AM), https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-be-worth-the-cost.html (last visited Dec. 17, 2024).
[47] *Id.*

on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

96.    Even more seriously is the identity restoration that Plaintiffs and other Class Members must go through, which can include spending countless hours filing police reports, filling out IRS forms, Federal Trade Commission checklists, Department of Motor Vehicle driver's license replacement applications, and calling financial institutions to cancel fraudulent credit applications, to name just a few of the steps Plaintiffs and the Class must take.

97.    Plaintiffs and the Class have or will experience the following concrete and particularized harms for which they are entitled to compensation, including:

   a.  Theft of their PII;

   b.  Actual identity theft;

   c.  Trespass, damage to, and theft of their personal property including PII;

   d.  Improper disclosure of their PII;

   e.  The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

   f.  Loss of privacy suffered as a result of the Data Breach, including the harm of knowing cyber criminals have their PII;

g.  Ascertainable losses in the form of time taken to respond to identity theft and attempt to restore identity, including lost opportunities and lost wages from uncompensated time off from work;

h.  Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;

i.  Ascertainable losses in the form of deprivation of the value of Plaintiffs' and Class Members' Private Information for which there is a well-established and quantifiable national and international market;

j.  The loss of use of and access to their credit, accounts, and/or funds;

k.  Damage to their credit due to fraudulent use of their PII; and/or

l.  Increased cost of borrowing, insurance, deposits, and the inability to secure more favorable interest rates because of a reduced credit score.

98.    Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which remains in the possession of Defendant, is protected from further breaches by the implementation of industry standard security measures and safeguards. Defendant has shown itself wholly incapable of protecting Plaintiffs' and the Class's Private Information.

99.    Plaintiffs and Class Members also have an interest in ensuring that their Private Information that was provided to Express is removed from all Express email accounts, servers, systems, and files.

100.   Defendant itself acknowledged the harm caused by the Data Breach because it offered Plaintiffs and Class Members woefully inadequate identity theft repair and monitoring services. Twelve (12) months of identity theft and repair and monitoring is, however, inadequate to protect Plaintiffs and Class Members from a lifetime of identity theft risk.

101.   Defendant further acknowledged that the Data Breach would cause inconvenience to affected individuals and that financial harm would likely occur because it advised individuals to "remain vigilant against incidents of identity theft and fraud" by enrolling in credit monitoring, placing a fraud alert/security freeze on credit files, monitoring financial accounts, and obtaining a free credit report.[48]

102.   Express also admitted its current data security measures were not adequate because it stated, "we are reviewing and enhancing our existing policies and procedures related to data privacy to reduce the likelihood of a similar event reoccurring in the future."[49]

103.   These enhanced protections should have been in place before the Data Breach.

104.   At Express's suggestion, Plaintiffs and the Class are desperately trying to mitigate the damage that Express has caused them.

105.   Given the kind of Private Information Express made accessible to hackers, however, Plaintiffs and the Class are certain to incur additional damages. Because identity

---

[48] *See* Exs. 1–3.
[49] *Id.*

thieves have their PII, Plaintiffs and all Class Members will need to have identity theft monitoring protection for the rest of their lives. Some may even need to go through the long and arduous process of getting a new Social Security number, with all the loss of credit and employment difficulties that come with a new number.[50]

106.    None of this should have happened because the Data Breach was entirely preventable.

### F.    Defendant was Aware of the Risk of Cyberattacks.

107.    Data security breaches have dominated the headlines for the last two decades. And it doesn't take an IT industry expert to know it. The general public can tell you the names of some of the biggest cybersecurity breaches: Target,[51] Yahoo,[52] Marriott International,[53] Chipotle, Chili's, Arby's,[54] and others.[55]

---

[50] *What happens if I change my Social Security number*, LEXINGTON LAW (Aug. 10, 2022), https://www.lexingtonlaw.com/blog/credit-101/will-a-new-social-security-number-affect-your-credit.html (last visited Dec. 17, 2024).

[51] Michael Kassner, *Anatomy of the Target Data Breach: Missed Opportunities and Lessons Learned*, ZDNET (Feb. 2, 2015, 8:29 AM PT), https://www.zdnet.com/article/anatomy-of-the-target-data-breach-missed-opportunities-and-lessons-learned/ (last visited Dec. 17, 2024).

[52] Martyn Williams, *Inside the Russian Hack of Yahoo: How They Did It*, CSOONLINE.COM (Oct. 4, 2017), https://www.csoonline.com/article/3180762/inside-the-russian-hack-of-yahoo-how-they-did-it.html (last visited Dec. 17, 2024).

[53] Patrick Nohe, *The Marriot Data Breach: Full Autopsy*, HASHEDOUT BY THE SSL STORE (Mar. 22, 2019), https://www.thesslstore.com/blog/autopsying-the-marriott-data-breach-this-is-why-insurance-matters/ (last visited Dec. 17, 2024).

[54] Alfred Ng, *FBI Nabs Alleged Hackers in Theft of 15M Credit Cards from Chipotle, Others*, CNET (Aug. 1, 2018, 12:58 PM), https://www.cnet.com/news/fbi-nabs-alleged-hackers-in-theft-of-15m-credit-cards-from-chipotle-others/?ftag=CMG-01-10aaa1b (last visited Dec. 17, 2024).

[55] *See, e.g.*, Michael Hill, Dan Swinhoe, and Johh Leyden, *The 18 Biggest Data Breaches of the 21st Century*, CSO ONLINE (Sept. 12, 2024),

108.    The number of data breach victims has surpassed 1 billion for the first half of 2024, according to the Identity Theft Resource Center.[56]

109.    Email security breaches are particularly common and can be prevented with simple measures such as: (i) security awareness training; (ii) multi-factor authentication; (iii) implementing domain-based message authentication, reporting and Conformance ("DMARC"); (iv) monitoring and analyzing email traffic; (v) using anti-virus and anti-malware solutions; and (vi) leveraging AI-powered email security solutions.[57] However, Express did not implement any of the above measures prior to the Breach.

110.    Express should certainly have been aware, and indeed was aware, that it was at risk of a data breach that could expose the PII that it collected and maintained. In fact, Bill Stoller, the CEO of Express, stated "[w]e can all do a better job protecting ourselves online, whether it's using strong passwords and two-factor authentication or staying up-to-

https://www.csoonline.com/article/2130877/the-biggest-data-breaches-of-the-21st-century.html (last visited Dec. 17, 2024).

[56] Betty Lin-Fisher, *There are 1 Billion Victims of Data Breaches so Far this Year. Are You One of the Them?*, USA TODAY (July 18, 2024, 5:10 AM ET) https://www.usatoday.com/story/money/2024/07/18/data-breach-what-to-do/74441060007/ (last visited Dec. 17, 2024).

[57] *Email Security Breaches: Common Causes and 7 Recent Data Breaches to Learn From*, PERCEPTION POINT, https://perception-point.io/guides/email-security/email-security-breaches/#:~:text=Email%20security%20breaches%20occur%20when,harm%20to%20an%20organization's%20reputation (last visited Dec. 17, 2024).

date on the latest technologies and trends[.]"[58] "Everyone is at risk-especially if they don't realize it."[59]

111.    Express was clearly aware of the risks it was taking and the harm that could result from inadequate data security but threw caution to the wind and engorged itself with the money it saved by not implementing adequate and industry standard data security.

**G.    Express Could Have Prevented the Data Breach**.

112.    Data breaches are preventable.[60] As Lucy Thompson wrote in the DATA BREACH AND ENCRYPTION HANDBOOK, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[61] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[62]

113.    "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. . . . Appropriate information security controls, including encryption, must be implemented and enforced in

---

[58] *Survey: Despite the Risks, Employees' Password Changing Habits are Lax*, Express Employment Professionals (June 26, 2019, 9:50 ET) available at https://www.prweb.com/releases/survey-despite-the-risks-employees-password-changing-habits-are-lax-888092622.html (last visited Dec. 17, 2024).

[59] *Id.*

[60] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.

[61] *Id.* at 17.

[62] *Id.* at 28.

a rigorous and disciplined manner so that a *data breach never occurs*."[63]

114.   In a data breach like this, many failures laid the groundwork for the Breach.

115.   The FTC has published guidelines that establish reasonable data security practices for businesses.

116.   The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[64]

117.   The FTC guidelines establish that businesses should protect the confidential information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems.

118.   The FTC guidelines also recommend that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

119.   According to information and belief, Express failed to maintain many reasonable and necessary industry standards necessary to prevent a data breach, including

---

[63] *Id.*

[64] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION, available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

the FTC's guidelines.

120.    Upon information and belief, Express also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity readiness.

121.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[65]

***Phishing Attacks***

122.    A "phishing attack," like the one that gave rise to the Data Breach, is "an attempt to steal sensitive information, typically in the form of usernames, passwords, credit card numbers, bank account information or other important data in order to utilize or sell the stolen information. By masquerading as a reputable source with an enticing request, an attacker lures in the victim in order to trick them, similarly to how a fisherman uses bait to catch a fish."[66]

---

[65] *See How to Protect Your Networks from RANSOMWARE*, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

[66] *What is a Phishing Attack?*, CLOUDFLARE, https://www.cloudflare.com/learning/access-management/phishing-attack/ (last visited Dec. 17, 2024).



123.   "A phishing attack relies on a social-engineering effort where hackers create a counterfeit communication that looks legitimate and appears to come from a trusted source. Attackers use seemingly benign emails or text messages to trick unsuspecting users into taking an action such as downloading malware, visiting an infected site, or divulging login credentials in order to steal money or data."[67]

124.   "This attack (in all its forms) is mitigated by not responding to requests from unknown parties in which money has to be given to receive something in return."[68]

125.   "Motivations for phishing attacks differ, but mainly attackers are seeking valuable user data such as personally identifiable information (PII) or login credentials that

---

[67] *What is a Phishing?*, CISCO, https://www.cisco.com/c/en/us/products/security/email-security/what-is-phishing.html (last visited Dec. 17, 2024).
[68] *What is a Phishing Attack?*, CLOUDFLARE, https://www.cloudflare.com/learning/access-management/phishing-attack/ (last visited Dec. 17, 2024).

33

can be used to commit fraud by accessing the victim's financial accounts. Once attackers have login information, personal data, access to online accounts, or credit card data, they can obtain permissions to modify or compromise more cloud-connected systems and in some cases, hijack entire computer networks until the victim pays a ransom."[69]

126.    To prevent and detect phishing incidents, including the one that resulted in the Data Breach, Express could and should have implemented the following measures, as recommended by the Federal Trade Commission:

- **Back Up Your Data:** Regularly back up your data and make sure those backups are not connected to the network. That way, if a phishing attack happens and hackers get to your network, you can restore your data. Make data backup part of your routine business operations.

- **Keep Your Security Up to Date:** Always install the latest patches and updates. Look for additional means of protection, like email authentication and intrusion prevention software, and set them to update automatically on your computers. On mobile devices, you may have to do it manually.

- **Alert Your Staff:** Share with them this information. Keep in mind that phishing scammers change their tactics often, so make sure you include tips for spotting the latest phishing schemes in your regular training.

---

[69] *What is a Phishing?*, CISCO, https://www.cisco.com/c/en/us/products/security/email-security/what-is-phishing.html (last visited Dec. 17, 2024).

- **Deploy a Safety Net:** Use email authentication technology to help prevent phishing emails from reaching your company's inboxes in the first place.[70]

127.    However, upon information and belief, Express did not implement or utilize any of the measures listed in the preceding paragraph, resulting in the Data Breach.

128.    Express should have instituted a spam filter to block emails that came from suspicious sources or contained suspicious content and enabled security messages for users such as banners that warn users when an email comes from outside the company. However, Express failed to do so, resulting in the Data Breach.

129.    Express also should have adequately trained its employees to understand the threat posed by phishing, identify the signs of phishing, and to take the proper precautions when they send or receive information over email, but Express failed to do so, resulting in the Data Breach.

130.    Express also should have used industry standard anti-phishing software designed to stop phishing emails from landing in employees' email inboxes, but failed to do so, resulting in the Data Breach.

131.    Additionally, to prevent phishing attacks from reaching end users, Express should have deployed the following industry standard measures:

- Anti-malware and anti-spam protection that filters incoming email and blocks phishing attacks from reaching users.

---

[70] *Cybersecurity for Small Business: Phishing*, FEDERAL TRADE COMMISSION, available at https://www.ftc.gov/system/files/attachments/phishing/cybersecurity_sb_phishing.pdf.

- DNS authentication measures that use DMARC, SPF and DKIM protocols to identify and stop suspicious messages.

- Email scanning and filtering technologies that scan all email and prevent users from clicking on malicious links or opening weaponized attachments, and that identify malware-less attacks that use social engineering techniques to impersonate a trusted source.

- Two-factor authentication protocols that prevent attackers from using information they have stolen to access accounts.[71]

132.    Express should have also adequately trained its employees to avoid phishing scams to prevent the Data Breach that ultimately came to pass, including:

- Identifying available training resources for employees;

- Training employees how to spot phishing;

- Alerting employees to the risks of phishing; and

- Developing a culture of awareness.[72]

133.    Express should have also configured employee email accounts according to the principle of "least privilege" to lessen the exposure in the event of a data breach.[73] The

---

[71] *Stop and Prevent Phishing Emails*, MIMECAST, https://www.mimecast.com/content/how-to-stop-and-prevent-phishing-emails/(last visited Dec. 17, 2024).

[72] *Teach Employees to Avoid Phishing*, CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY, https://www.cisa.gov/secure-our-world/teach-employees-avoid-phishing (last visited Dec. 17, 2024).

[73] *Small Business Guide: Cyber Security*, Step 5 – Avoid Phishing Attacks, NATIONAL CYBER SECURITY CENTRE, https://www.ncsc.gov.uk/collection/small-business-guide/avoiding-phishing-attacks (last visited Dec. 17, 2024).

impact of the Data Breach could have been significantly reduced had Express applied the principle of least privilege.

134.    Further, Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following data security measures:

- **Update and patch your computer**.  Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**.  Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**.  Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**.  If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**.  Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[74]

*Malware Attacks*

135.    Alternatively, to prevent malware attacks, Defendant could and should have implemented, as recommended by the Federal Bureau of Investigation, the following

---

[74] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), available at https://www.cisa.gov/news-events/news/protecting-against-ransomware.

measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational

units.[75]

### *Ransomware Attacks*

136.    Alternatively, to prevent and detect ransomware attacks Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**

    - Apply latest security updates

    - Use threat and vulnerability management

    - Perform regular audit; remove privileged credentials

- **Thoroughly investigate and remediate alerts**

    - Prioritize and treat commodity malware infections as potential full compromise;

- **Include IT Pros in security discussions**

    - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

- **Build credential hygiene**

    - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

---

[75] *Id.* at 3–4.

- **Apply principle of least-privilege**

  - Monitor for adversarial activities

  - Hunt for brute force attempts

  - Monitor for cleanup of Event Logs

  - Analyze logon events

- **Harden infrastructure**

  - Use Windows Defender Firewall

  - Enable tamper protection

  - Enable cloud-delivered protection

  - Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[76]

***Regardless of the Method of the Breach, Express had Key Data Security Failures***

137.    Given that Express was storing the PII of thousands of individuals, Express could have and should have implemented all the above measures to prevent and detect the Data Breach that ultimately came to pass.

138.    Specifically, among other failures, Express had far too much confidential unencrypted information held on its systems and email accounts.  Such PII should have

---

[76] *See Human-Operated Ransomware Attacks: A Preventable Disaster*, MICROSOFT (Mar 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Dec. 17, 2024).

been segregated into an encrypted system or completely removed from its email accounts altogether.[77]

139.    Moreover, it is a well-established industry standard practice for a business to dispose of confidential PII once it is no longer needed. The FTC, among others, has repeatedly emphasized the importance of disposing unnecessary PII, saying simply: "Keep sensitive data in your system only as long as you have a business reason to have it. Once that business need is over, properly dispose of it. If it's not on your system, it can't be stolen by hackers."[78] Express, rather than following this basic standard of care, kept thousands of individuals' unencrypted PII indefinitely.

140.    In sum, the Data Breach could have readily been prevented through the use of industry standard network segmentation and encryption of all PII.

141.    Further, the scope of the Data Breach could have been dramatically reduced had Express utilized proper record retention and destruction practices.

### H. Plaintiffs' Individual Experiences

***Plaintiff Kurtis Sabo***

142.    Plaintiff Sabo received a Notice of Data Breach Letter from Defendant informing him that his highly confidential Private Information was **accessed, copied, and**

---

[77] *See, e.g.,* Adnan Raja, *How to Safeguard Your Business Data with Encryption*, DIGITAL GUARDIAN (Aug. 14, 2018), https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption (last visited Dec. 17, 2024).

[78] *Protecting Personal Information: A Guide for Business*, FTC, *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf, at p. 6.

**stolen** in the Data Breach.

143.   Defendant was in possession of Plaintiff Sabo's Private Information before, during, and after the Data Breach.

144.   Because of the Data Breach, there is no doubt Plaintiff Sabo's highly confidential Private Information is in the hands of cybercriminals. Reason being, the Notice of Data Breach Letter from Defendant not only disclosed that an unauthorized third-party accessed Defendant's email accounts, but it confirmed that the unauthorized criminal actor **copied** files containing his highly sensitive PII.  As such, Plaintiff Sabo and the Class are at an imminent risk of identity theft and fraud.

145.   As a result of the Data Breach, Plaintiff Sabo has already expended hours of his time and has suffered a loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including investigating the Data Breach, investigating how best to ensure that he is protected from identity theft, and reviewing account statements, credit reports, and/or other information.

146.   Plaintiff Sabo places significant value on the security of his Private Information and does not readily disclose it.   Plaintiff Sabo has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

147.   Plaintiff Sabo has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach. Indeed, Defendant acknowledged the

present and increased risk of future harm Plaintiff Sabo, and the Class now face by offering temporary, non-automatic credit monitoring services to Plaintiff Sabo and the Class.

148.    Knowing that thieves intentionally targeted and stole his Private Information, including his Social Security number, and knowing that his Private Information is in the hands of cybercriminals has caused Plaintiff Sabo great anxiety beyond mere worry. Specifically, Plaintiff Sabo has lost hours of sleep, is in a constant state of stress, and is very frustrated now that his Private Information has been stolen.

149.    Plaintiff Sabo has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff's and the Class's Private Information will be wholly unprotected and at-risk of future data breaches.

150.    Plaintiff Sabo has suffered injuries directly and proximately caused by the Data Breach, including: (i) theft of his valuable Private Information; (ii) the imminent and certain impending injury flowing from anticipated fraud and identity theft posed by his Private Information being placed in the hands of cybercriminals; (iii) damages to and diminution in value of his Private Information that was entrusted to Defendant with the understanding that Defendant would safeguard this information against disclosure; (iv) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—i.e., the difference in value between what Plaintiff Sabo should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect his Private

Information; and (v) continued risk to his Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information that was entrusted to Defendant.

***Plaintiff Karli***

151.    Plaintiff Karli received a Notice of Data Breach Letter from Defendant informing him that his highly confidential Private Information was **accessed, copied, and stolen** in the Data Breach.

152.    Defendant was in possession of Plaintiff Karli's Private Information before, during, and after the Data Breach.

153.    Because of the Data Breach, there is no doubt Plaintiff Karli's highly confidential Private Information is in the hands of cybercriminals. Reason being, the Notice of Data Breach Letter from Defendant not only disclosed that an unauthorized third-party accessed Defendant's email accounts, but it confirmed that the unauthorized criminal actor **copied** files containing his highly sensitive PII.  As such, Plaintiff Karli and the Class are at imminent risk of identity theft and fraud.

154.    As a result of the Data Breach, Plaintiff Karli has already expended hours of his time and has suffered a loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including investigating the Data Breach, investigating how best to ensure that he is protected from identity theft, and reviewing account statements, credit reports, and/or other information. Plaintiff Karli checks his accounts throughout the day each day, spending approximately

an hour per week just monitoring accounts because of Defendant's Data Breach.

155.    Plaintiff Karli has suffered actual misuse of his PII exposed in the Data Breach. Plaintiff Karli received notice of fraudulent charge on his bank account in July 2024, shortly after Defendant claims Plaintiff's PII was stolen by unauthorized actors. This instance of fraud is not a coincidence and is directly traceable to the Data Breach. Express admitted Plaintiff Karli's Social Security number was exposed in the Data Breach. Social Security numbers can be used to access existing bank accounts.[79] Furthermore, Express reported to the Texas Attorney General's Office that payment card information was exposed, which means Plaintiff Karli's financial information could have been exposed as well.[80]

156.    Due to the fraud resulting from the Data Breach, Plaintiff Karli cancelled his bank cards and eliminated online banking to prevent further intrusion and theft of his Private Information. As a result, Plaintiff Karli must now request and review his bank account on paper statements and go in-person to do his banking, costing Plaintiff Karli

---

[79] *See What Can Someone do with Your SSN: 6 Main Ways they can Exploit You*, SURFSHARK (Aug. 21, 2024), https://surfshark.com/blog/what-can-someone-do-with-your-ssn ("An identity thief can use your SSN together with your PII to open new bank accounts or access existing ones, take out credit cards, and apply for loans all in your name.") (last visited Dec. 17, 2024); Aranza Trevino, *What Can Someone Do with Your Social Security Number?*, KEEPER, https://www.keepersecurity.com/blog/2024/02/07/what-can-someone-do-with-your-social-security-number/#:~:text=If%20someone%20steals%20your%20Social,commit%20other%20types%20of%20fraud (last visited Dec. 17, 2024).

[80] *Data Security Breach Reports*, ATTORNEY GENERAL OF TEXAS, available at https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (search "Express Services, Inc.") (last visited Dec. 17, 2024).

considerable time and effort going forward.

157. Plaintiff Karli places significant value on the security of his Private Information and does not readily disclose it. Plaintiff Karli has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

158. Plaintiff Karli has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information stolen in the Data Breach. Indeed, Defendant acknowledged the present and increased risk of future harm Plaintiff Karli, and the Class now face by offering temporary, non-automatic credit monitoring services to Plaintiff Karli and the Class.

159. Knowing that thieves intentionally targeted and stole his Private Information, including his Social Security number, and knowing that his Private Information is in the hands of cybercriminals has caused Plaintiff Karli great anxiety beyond mere worry. Because of Defendant's Data Breach, Plaintiff Karli has suffered and will continue to suffer from anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff Karli's injuries are precisely the type of injuries that the law contemplates and addresses.

160. Plaintiff Karli has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff's and the Class's Private Information will be wholly unprotected and at-risk of

future data breaches.

161.    Plaintiff Karli has suffered injuries directly and proximately caused by the

Data Breach, including: (i) theft of his valuable Private Information; (ii) the imminent and

certain impending injury flowing from anticipated fraud and identity theft posed by his

Private Information being placed in the hands of cybercriminals; (iii) damages to and

diminution in value of his Private Information that was entrusted to Defendant with the

understanding that Defendant would safeguard this information against disclosure; (iv) loss

of the benefit of the bargain with Defendant to provide adequate and reasonable data

security—i.e., the difference in value between what Plaintiff Karli should have received

from Defendant and Defendant's defective and deficient performance of that obligation by

failing to provide reasonable and adequate data security and failing to protect his Private

Information; and (v) continued risk to his Private Information, which remains in the

possession of Defendant and which is subject to further breaches so long as Defendant fails

to undertake appropriate and adequate measures to protect the Private Information that was

entrusted to Defendant.

***Plaintiff Kristin Lunsford***

162.    Plaintiff Lunsford received a Notice of Data Breach Letter from Defendant

informing her that her highly confidential Private Information was **accessed, copied, and**

**stolen** in the Data Breach.

163.    Defendant was in possession of Plaintiff Lunsford's Private Information

before, during, and after the Data Breach.

164.    Because of the Data Breach, there is no doubt Plaintiff Lunsford's highly

confidential Private Information is in the hands of cybercriminals. Reason being, the Notice of Data Breach Letter from Defendant not only disclosed that an unauthorized third-party accessed Defendant's email accounts, but it confirmed that the unauthorized criminal actor **copied** files containing her highly sensitive PII.[81]  As such, Plaintiff Lunsford and the Class are at an imminent risk of identity theft and fraud.

165.    As a result of the Data Breach, Plaintiff Lunsford has already expended hours of her time and has suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including investigating the Data Breach, investigating how best to ensure that she is protected from identity theft, and reviewing account statements, credit reports, and/or other information.

166.    Plaintiff Lunsford has already suffered misuse of her PII as a result of the Data Breach. Plaintiff Lunsford has experienced significant identity theft after the Data Breach, including an attempted auto loan that utilized her Social Security Number— which was exposed in the Data Breach. Plaintiff Lunsford has also been flagged for fraud and cannot open a bank account due to the Breach.

167.    Plaintiff Lunsford places significant value on the security of her Private Information and does not readily disclose it.  Plaintiff Lunsford has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

168.    Plaintiff Lunsford has been and will continue to be at a heightened and

---

[81] *Id.*

substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information compromised by the Data Breach. Indeed, Defendant acknowledged the present and increased risk of future harm Plaintiff Lunsford, and the Class now face by offering temporary, non-automatic credit monitoring services to Plaintiff Lunsford and the Class.

169.    Knowing that thieves intentionally targeted and stole her Private Information, including her Social Security number, and knowing that her Private Information is in the hands of cybercriminals has caused Plaintiff Lunsford great anxiety beyond mere worry. Specifically, Plaintiff Lunsford has lost hours of sleep, is in a constant state of stress, is very frustrated, and is in a state of persistent worry now that her Private Information has been stolen.

170.    Plaintiff Lunsford has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in the possession of Defendant, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiffs' and the Class's Private Information will be wholly unprotected and at-risk of future data breaches.

171.    Plaintiff Lunsford has suffered injuries directly and proximately caused by the Data Breach, including: (i) theft of her valuable Private Information; (ii) the imminent and certain impending injury flowing from anticipated fraud and identity theft posed by her Private Information being placed in the hands of cybercriminals; (iii) damages to and diminution in value of her Private Information that was entrusted to Defendant with the

understanding that Defendant would safeguard this information against disclosure; (iv) loss of the benefit of the bargain with Defendant to provide adequate and reasonable data security—*i.e.*, the difference in value between what Plaintiff Lunsford should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect her Private Information; and (v) continued risk to her Private Information, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information that was entrusted to Defendant.

## V.    CLASS ACTION ALLEGATIONS

172.    Plaintiffs incorporate by reference all preceding paragraphs as if fully restated here.

173.    Plaintiffs bring this action against Express on behalf of themselves and all other individuals similarly situated under Federal Rule of Civil Procedure 23. Plaintiffs asserts all claims on behalf of a nationwide class (the "Class") defined as follows:

> **All persons who were sent a Notice of Data Breach Letter from Express after the Data Breach.**

174.    Excluded from the Class is Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and members of their immediate families and judicial staff.

175.    Plaintiffs reserve the right to amend the above definition or to propose subclasses in subsequent pleadings and motions for class certification.

176.    Upon information and belief, Defendant's own business records or electronic media can be utilized for the notice process.

177.    The proposed Class meets the requirements of Federal Rule of Civil Procedure 23.

178.    **Numerosity:** The proposed Class is so numerous that joinder of all members is impracticable. The Class is comprised of at least 5,000 individuals.[82]

179.    **Typicality:** Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and all members of the Class were injured through Express's uniform misconduct. Express's inadequate data security gave rise to Plaintiffs' claims and are identical to those that give rise to the claims of every other Class Member because Plaintiffs and each member of the Class had their sensitive PII compromised in the same way by the same conduct of Express.

180.    **Adequacy:** Plaintiffs are adequate representatives of the Class because Plaintiffs' interests do not conflict with the interests of the Class; Plaintiffs have retained counsel competent and highly experienced in data breach class action litigation; and Plaintiffs and Plaintiffs' counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

---

[82] *Data Security Breach Reports*, ATTORNEY GENERAL OF TEXAS, available at https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (search "Express Services, Inc.") (last visited Dec. 17, 2024).

181.    **Superiority:** A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class. The injury suffered by each individual class member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for members of the Class individually to effectively redress Express's wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

182.    **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

      a.    Whether Defendant engaged in the wrongful conduct alleged herein;

      b.    Whether Defendant failed to adequately safeguard Plaintiffs' and the Class's PII;

      c.    Whether Defendant owed a duty to Plaintiffs and the Class to adequately protect their PII, and whether it breached this duty;

      d.    Whether Express breached its duties to Plaintiffs and the Class;

e.  Whether Express failed to provide adequate cyber security;

f.  Whether Express knew or should have known that its computer, email accounts, and network security systems were vulnerable to cyber-attacks;

g.  Whether Express's conduct, including its failure to act, resulted in or was the proximate cause of the Breach;

h.  Whether Express was negligent in permitting unencrypted PII of vast numbers of individuals to be stored within its email accounts;

i.  Whether Express was negligent in failing to adhere to reasonable retention policies, thereby greatly increasing the size of the Data Breach;

j.  Whether Express breached implied contractual duties to Plaintiffs and the Class to use reasonable care in protecting their PII;

k.  Whether Express failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiffs and the Class;

l.  Whether Express continues to breach duties to Plaintiffs and the Class;

m. Whether Plaintiffs and the Class suffered injury as a proximate result of Express's negligent actions or failures to act;

n.  Whether Plaintiffs and the Class are entitled to recover damages, equitable relief, and other relief; and

o.  Whether Express's actions alleged herein constitute gross negligence, and whether Plaintiffs and Class Members are entitled to punitive damages.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (On Behalf of Plaintiffs and the Class)

183.    Plaintiffs incorporate paragraphs 1–182 as though fully set forth herein.

184.    Express solicited, gathered, and stored the PII of Plaintiffs and Class Members.

185.    Upon accepting and storing the PII of Plaintiffs and Class Members on its computer systems and networks, Defendant undertook and owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII of Plaintiffs and the Class from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

186.    Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if the PII was wrongfully disclosed. Plaintiffs and Class Members were the foreseeable victims of any inadequate safety and security practices. Plaintiffs and the Class Members had no ability to protect their PII that was in Defendant's possession. As such, a special relationship existed between Defendant and Plaintiffs and the Class.

187.    Because of this special relationship, Defendant required Plaintiffs and Class Members to provide their PII, including names, Social Security numbers, and other PII.

188.    Implied in these exchanges was a promise by Defendant to ensure that the PII of Plaintiffs and Class Members in its possession was only used for the provided purpose and that Defendant would destroy any PII that it was not required to maintain.

56

189.    As part of this special relationship, Defendant had a duty to perform with skill, care, and reasonable expedience and faithfulness.

190.    Through Defendant's acts and omissions, including Defendant's failure to provide adequate data security, its failure to protect Plaintiffs' and Class Members' PII from being foreseeably accessed, and its improper retention of PII it was not required to maintain, Defendant negligently failed to observe and perform its duty.

191.    Plaintiffs and Class Members did not receive the benefit of the bargain with Defendant, because providing their PII was in exchange for Defendant's implied agreement to secure and keep it safe and to delete it once no longer required.

192.    Defendant was aware of the fact that cybercriminals routinely target businesses such as Express through cyberattacks in an attempt to steal PII. In other words, Defendant knew of a foreseeable risk to its data security systems but failed to implement reasonable security measures.

193.    Defendant owed Plaintiffs and the Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiffs and the Class when obtaining, storing, using, and managing PII, including taking action to reasonably safeguard or delete such PII and providing notification to Plaintiffs and the Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

194.    Defendant's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats

protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B.

195.    Defendant had duties to protect and safeguard the PII of Plaintiffs and the Class from being vulnerable to cyberattacks by taking common-sense precautions when dealing with sensitive PII. Additional duties that Defendant owed Plaintiffs, and the Class include:

a.    To exercise reasonable care in designing, implementing, maintaining, monitoring, and testing Defendant's email accounts, networks, systems, protocols, policies, procedures and practices to ensure that Plaintiffs' and Class Members' PII was adequately secured from impermissible release, disclosure, and publication;

b.    To protect Plaintiffs' and Class Members' PII in its possession by using reasonable and adequate security procedures and systems;

c.    To implement processes to quickly detect a data breach, security incident, or intrusion involving its email accounts, networks, and servers; and

d.    To promptly notify Plaintiffs and Class Members of any data breach, security incident, or intrusion that affected or may have affected their PII.

196.    Plaintiffs and the Class were the intended beneficiaries of Defendant's duties, creating a special relationship between them and Defendant. Defendant was in a position to ensure that its systems were sufficient to protect the PII that Plaintiffs and the Class had entrusted to it.

58

197.    Plaintiffs' injuries and damages, as described herein, are a reasonably certain consequence of Defendant's negligence and breach of its duties.

198.    Defendant breached its duties of care by failing to adequately protect Plaintiffs' and Class Members' PII. Defendant breached its duties by, among other things:

a.    Failing to exercise reasonable care in obtaining, retaining securing, safeguarding, and protecting the PII in its possession;

b.    Failing to protect the PII in its possession using reasonable and adequate security procedures and systems;

c.    Failing to consistently enforce security policies aimed at protecting Plaintiffs and the Class's PII;

d.    Failing to implement processes to quickly detect data breaches, security incidents, or intrusions;

e.    Failing to promptly notify Plaintiffs and Class Members of the Data Breach that affected their PII.

199.    Defendant's willful failure to abide by these duties was wrongful, reckless, and grossly negligent considering the foreseeable risks and known threats.

200.    As a direct and proximate result of Defendant's negligent conduct, including but not limited to its failure to implement and maintain reasonable data security practices and procedures as described above, Plaintiffs and the Class have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

201.    Through Defendant's acts and omissions described herein, including but not limited to Defendant's failure to protect the PII of Plaintiffs and Class Members from being

stolen and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure the PII of Plaintiffs and Class Members while it was within Defendant's possession and control.

202.    Further, through its failure to provide timely and clear notification of the Data Breach to Plaintiffs and Class Members, Defendant prevented Plaintiffs and Class Members from taking meaningful, proactive steps to securing their PII and mitigating damages.

203.    Plaintiffs and Class Members could have taken actions earlier had they been timely notified of the Data Breach. Plaintiffs and Class Members could have enrolled in credit monitoring, could have instituted credit freezes, and could have changed their passwords, among other things, had they been alerted to the Data Breach more quickly.

204.    Plaintiffs and Class Members have suffered harm from the delay in notifying them of the Data Breach.

205.    As a direct and proximate cause of Defendant's conduct, including but not limited to its failure to implement and maintain reasonable security practices and procedures, Plaintiffs and Class Members have suffered, as Plaintiffs have, and/or will suffer injury and damages, including but not limited to: (i) the loss of the opportunity to determine for themselves how their PII is used; (ii) the publication and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII, including the need for substantial credit monitoring and identity protection services for an extended period of time; (iv) lost opportunity costs associated with effort expended and the loss of productivity

addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from tax fraud and identity theft; (v) costs associated with placing freezes on credit reports and password protections; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of employees in its continued possession; and, (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII for the rest of their lives. Thus, Plaintiffs and the Class are entitled to damages in an amount to be proven at trial.

206.    The damages Plaintiffs and the Class have suffered (as alleged above) and will suffer were and are the direct and proximate result of Defendant's negligent conduct.

207.    Plaintiffs and the Class have suffered injury and are entitled to actual and punitive damages in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiffs and the Class)**

208.    Plaintiffs incorporate paragraphs 1–182 as though fully set forth herein.

209.    Pursuant to the FTC Act, 15 U.S.C. § 45(a), Defendant had a duty to Plaintiffs and the Class to provide fair and adequate computer systems and data security to safeguard the PII of Plaintiffs and the Class.

210.    The FTC Act prohibits "unfair practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also formed part of the basis of Defendant's duty in this regard.

211.    Defendant gathered and stored the PII of Plaintiffs and the Class as part of their business which affects commerce.

212.    Defendant violated the FTC Act by failing to use reasonable measures to protect the PII of Plaintiffs and the Class and by not complying with applicable industry standards, as described herein.

213.    Defendant breached its duties to Plaintiffs and the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and/or data security practices to safeguard Plaintiffs' and Class Members' PII, and by failing to provide prompt notice without reasonable delay.

214.    Defendant's multiple failures to comply with applicable laws and regulations constitutes negligence *per se*.

215.    Plaintiffs and the Class are within the class of persons that the FTC Act was intended to protect.

216.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against.

62

217.    Defendant breached its duties to Plaintiffs and the Class under the FTC Act by failing to provide fair, reasonable, or adequate email accounts, computer systems, and data security practices to safeguard Plaintiffs' and the Class's PII.

218.    Defendant breached its duties to Plaintiffs and the Class by unreasonably delaying and failing to provide notice of the Data Breach expeditiously and/or as soon as practicable to Plaintiffs and the Class.

219.    Defendant's violations of the FTC Act constitute negligence *per se*.

220.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, damages arising from the Data Breach, as alleged above.

221.    The injury and harm that Plaintiffs and Class Members suffered (as alleged above) was the direct and proximate result of Defendant's negligence *per se*.

222.    Plaintiffs and the Class have suffered injury and are entitled to damages in amounts to be proven at trial.

**THIRD CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Class)**

223.    Plaintiffs incorporate paragraphs 1–182 as though fully set forth herein.

224.    Plaintiffs and Class Members were required to deliver their PII to Defendant as part of the process of obtaining employment services provided by Defendant.

225.    Defendant solicited, offered, and invited Class Members to provide their PII as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their PII to Defendant.

63

226.    Defendant accepted possession of Plaintiffs' and Class Members' PII for the purpose of providing employment services to Plaintiffs and Class Members. Had Plaintiffs been aware that Defendant's email accounts were not secure, they would not have entrusted Defendant with their PII.

227.    Plaintiffs and the Class entrusted their PII to Defendant. In so doing, Plaintiffs and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen.

228.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations (including FTC guidelines on data security) and were consistent with industry standards.

229.    Implicit in the agreement between Plaintiffs and Class Members and the Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiffs and Class Members from unauthorized disclosure or uses, (f) retain the PII only under conditions that kept such information secure and confidential.

230. The mutual understanding and intent of Plaintiffs and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

231. On information and belief, at all relevant times Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiffs and Class Members that it would only disclose PII under certain circumstances, none of which relate to the Data Breach.

232. On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiffs' and Class Members' PII would remain protected.

233. Plaintiffs and Class Members paid money to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

234. Plaintiffs and Class Members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

235. Plaintiffs and Class Members would not have entrusted their PII to Defendant in the absence of their implied promise to monitor their email accounts, computer systems, and networks to ensure that it adopted reasonable data security measures.

236. Every contract in this State has an implied covenant of good faith and fair dealing, which is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

237.    Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

238.    Defendant breached the implied contracts it made with Plaintiffs and the Class by failing to safeguard and protect their PII, by failing to delete the information of Plaintiffs and the Class once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

239.    Defendant breached the implied covenant of good faith and fair dealing by failing to maintain adequate email accounts, computer systems, and data security practices to safeguard PII, failing to timely and accurately disclose the Data Breach to Plaintiffs and Class Members and continued acceptance of PII and storage of other  PII after Defendant knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

240.    As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiffs and Class Members sustained damages, including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized

disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

241.    Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

242.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**FOURTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

243.    Plaintiffs incorporate paragraphs 1–182 as though fully set forth herein.

244.    Plaintiffs allege this claim in the alternative to their breach of contract claim.

245.    Defendant knew that Plaintiffs and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the PII entrusted to it. Defendant profited from Plaintiffs' retained data and commercialized and used Plaintiffs' and Class Members' PII for business purposes.

246.    Plaintiffs reasonably understood that a portion of the funds employers paid Defendant to hire job seekers such as Plaintiffs would be used to pay for adequate cybersecurity and protection of Private Information.

247.    Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments on behalf of or for the benefit of Plaintiffs and Class Members.

248.    As such, a portion of the payments made for the benefit of or on behalf of Plaintiffs and Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

249.    Defendant failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their PII provided.

250.    Defendant acquired the PII through inequitable means as it failed to disclose the inadequate data security practices previously alleged. If Plaintiffs and Class Members had known that Defendant would not fund adequate data security practices, procedures, and protocols to sufficiently monitor, supervise, and secure their PII, they would not have entrusted their Private Information to Defendant or obtained services from Defendant's clients.

251.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective data security measures and diverting those funds to their own benefit. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their PII.

252.    Plaintiffs and Class Members have no adequate remedy at law.

253. Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon it.

254. As a direct and proximate result of Defendant's conduct, Plaintiffs and other Class Members, have suffered actual harm in the form of experiencing specific acts of fraudulent activity and other attempts of fraud that required Plaintiffs' efforts to prevent from succeeding.

255. As a result of Defendant's wrongful conduct, as alleged above, Plaintiffs and the Class are entitled to restitution and disgorgement of profits, benefits, and other compensation obtained by Defendant and all other relief allowed by law.

**FIFTH CAUSE OF ACTION**
**DECLARATORY AND INJUNCTIVE RELIEF**
**(On Behalf of Plaintiffs and the Class)**

256. Plaintiffs incorporates paragraphs 1–182 as though fully set forth herein.

257. This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

258. As previously alleged, Plaintiffs and members of the Class are entered into implied contracts with Defendant, which contracts require Defendant to provide adequate security for the PII collected from Plaintiffs and the Class.

259. Defendant owed and still owes a duty of care to Plaintiffs and Class Members that require it to adequately secure Plaintiffs' and Class Members' PII.

260. Upon reason and belief, Defendant still possesses the PII of Plaintiffs and the Class Members.

261.    Defendant has not satisfied its contractual obligations and legal duties to Plaintiffs and the Class Members.

262.    Since the Data Breach, Defendant has not yet announced any changes to its data security infrastructure, processes or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Data Breach to occur and go undetected and, thereby, prevent further attacks.

263.    Defendant has not satisfied its contractual obligations and legal duties to Plaintiffs and the Class. In fact, now that Defendant's insufficient data security is known to hackers, the PII in Defendant's possession is even more vulnerable to cyberattack.

264.    Actual harm has arisen in the wake of the Data Breach regarding Defendant's contractual obligations and duties of care to provide security measures to Plaintiffs and the members of the Class. Further, Plaintiffs and the members of the Class are at risk of additional or further harm due to the exposure of their PII and Defendant's failure to address the security failings that led to such exposure.

265.    There is no reason to believe that Defendant's security measures are any more adequate now than they were before the Data Breach to meet Defendant's contractual obligations and legal duties.

266.    Plaintiffs and the Class, therefore, seek a declaration (1) that Defendant's existing security measures do not comply with its contractual obligations and duties of care to provide adequate security, and (2) that to comply with its contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

a.  Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b.  Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

c.  Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

d.  Ordering that Defendant segment employee data by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of Defendant's systems;

e.  Ordering that Defendant purge, delete, and destroy, in a reasonably secure manner, customer data not necessary for their provisions of services;

f.  Ordering that Defendant conduct regular database scanning and security checks; and

g.  Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

Case 5:24-cv-00974-J    Document 23    Filed 12/23/24    Page 72 of 74


## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for judgment against Defendant as follows:

a.   An order certifying this action as a class action under Federal Rule of Civil Procedure 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Class requested herein;

b.   A judgment in favor of Plaintiffs and the Class awarding them appropriate monetary relief, including compensatory damages, punitive damages, attorney fees, expenses, costs, and such other and further relief as is just and proper;

c.   An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d.   An order requiring Defendant to pay the costs involved in notifying the Class Members about the judgment and administering the claims process;

e.   A judgment in favor of Plaintiffs and the Class awarding them pre-judgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

f.   An award of such other and further relief as this Court may deem just and proper.

## VIII.    DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all appropriate issues raised in this Consolidated Class Action Complaint.

Dated:  December 23, 2024                Respectfully submitted,

                                         */s/: William B. Federman*
                                         William B. Federman, OBA No. 2853
                                         Interim Lead Class Counsel
                                         **FEDERMAN & SHERWOOD**
                                         10205 N. Pennsylvania Ave.
                                         Oklahoma City, OK 73120
                                         T: (405) 235-1560
                                         F: (405) 239-2112
                                         E: wbf@federmanlaw.com

                                         Gary M. Klinger
                                         (Admitted *pro hac vice*)
                                         **MILBERG COLEMAN BRYSON
                                         PHILLIPS GROSSMAN LLC**
                                         227 W. Monroe Street, Suite 2100
                                         Chicago, IL 60606
                                         Phone: (866) 252-0878
                                         E: gklinger@milberg.com

                                         Leigh S. Montgomery
                                         (Admitted *pro hac vice*)
                                         **EKSM, LLP**
                                         1105 Milford Street
                                         Houston, TX 77006
                                         Ph: (888) 350-3931
                                         Fax: (888) 276-3455
                                         E: lmontgomery@eksm.com

## CERTIFICATE OF SERVICE

I certify that on December 23, 2024, this motion was filed in the United States District Court for the Western District of Oklahoma, and a true and correct copy of this motion was served via ECF on all counsel of record appearing in this case.

*/s/: William B. Federman*